**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Goldwater Bank NA,

               Plaintiff,

v.

Caliber Home Loans Incorporated, et al.,

               Defendants.

No. CV-21-01190-PHX-MTM

**ORDER**

Before the Court is Plaintiff Goldwater Bank NA's ("Goldwater") Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction (doc. 9). The Court considers the Motion (*id.*); Defendants' Responses (docs. 21, 24); Goldwater's Replies (docs. 30, 31); arguments, testimony, and evidence presented at the September 24, 2021 hearing (doc. 63); and the parties' post-hearing briefs (docs. 62, 71). For the following reasons, Goldwater's Motion will be denied.

## I.    BACKGROUND

Goldwater is a financial institution that deals in consumer loan origination. (Doc. 9-2 ¶ 3). Defendant Julia Magler was a loan originator at Refined Lending, a division of Goldwater, in Blaine, Minnesota from March 29, 2018 until her voluntary departure on June 11, 2021. (*Id.* ¶¶ 11, 14; Doc. 21-1 ¶ 4). Magler then became a mortgage loan officer at Defendant Caliber Home Loans Inc. ("Caliber") at a Caliber branch in Blaine, Minnesota. (Doc. 21-1 ¶¶ 8, 16; Doc. 1 ¶ 25). Defendants Shelly Farris and Amy Waller work at the same Caliber branch as a sales manager and production assistant, respectively.

(Doc. 21-1 ¶ 16; Doc. 22-1 ¶ 4; Doc. 22-2 ¶ 4).

Upon hire, Goldwater and Magler executed an Employment Agreement (doc. 1-2 at 10). (Doc. 9-2 ¶ 13; Doc. 21-1 ¶ 5). In it, Magler acknowledged that "customer information" was "Confidential Information" to be used solely for Goldwater's benefit, maintained as secret, and returned upon termination of employment. (Doc. 1-2 at 7, Art. 5, §§ 1–2). Magler further acknowledged that all "leads" and "loans in process" were property of Goldwater and that she would not "take any action to divert such loans to a competitor or away from [Goldwater]." (*Id.* at 7–8, Art. 5, § 3). Magler agreed to show the Employment Agreement to any subsequent employer she worked with within twelve months of terminating employment with Goldwater. (*Id.* at 8, Art. 5, § 6).

Goldwater alleges in the weeks preceding her departure from Goldwater, Magler committed the following breaches of the Employment Agreement. (Doc. 9-2 ¶ 15). Between May 25, 2021 and June 11, 2021, Magler allegedly sent confidential customer information to her personal email account. (Doc. 9-3, Ex. C, at 20–26). On May 26, 2021, Magler allegedly sent Farris and Waller a list of five Goldwater applicant files she would be submitting to Caliber and stated she would be sending "full packages on all submissions." (Doc. 9-3, Ex. D, at 27–31). A full "loan package" contains financial information necessary for closing the loan, which includes an applicant's purchase agreement, bank statements, tax returns, pay stubs, W-2s, and closing worksheets. (*See* Doc. 63 at 23; Doc. 9-2 ¶ 15). Between May 26, 2021 and June 11, 2021, Magler allegedly sent loan purchase agreements, bank statements, pay stubs, tax returns, W-2s, and closing worksheets for "several" Goldwater customers to Farris and Waller; the actual number of customers, however, is unclear.[1]  (Doc. 9-3, Ex. E, at 32–50). Between May 26, 2021 and

---

[1]    At the hearing, Goldwater alleged there are an "additional two loans that are found in the emails in [doc. 9-3] that are unaccounted for." (Doc. 63 at 38). Upon review of the emails in Doc. 9-3, the Court cannot conclude the truth of this allegation. The emails contain extensive redactions that make it impossible to connect a particular email to a particular application/applicant. (*See* Doc. 9-3 at 27–68). The subject lines and names of files attached to those emails are equally unenlightening. The only reasonable number of applications that can be discerned from the emails as presented is six. In a May 26, 2021

June 11, 2021, Magler allegedly submitted at least five applications using Goldwater customer information to Caliber's online portal. (Doc. 9-3, Ex. F, at 51–62). On at least two occasions, Farris and Waller allegedly requested specific confidential customer information from Magler. (*Id.* at 35 [5/26/2021: Farris requested an applicant's "full name, address they are buying, loan type, purchase price and loan amount"], 48 [6/8/2021: Waller requested an applicant's tax returns]).

On July 8, 2021, Goldwater sued Caliber, Magler, Farris, and Waller, claiming: (1) tortious interference with contract, (2) tortious interference with prospective economic advantage, (3) misappropriation of trade secrets, (4) breach of employment agreement, (5) breach of good faith and fair dealing, (6) breach of fiduciary duty, and (7) aiding and abetting breach of fiduciary duty. (Doc. 1 ¶¶ 33–84).

## II.   INJUNCTIVE RELIEF SOUGHT

On July 16, 2021, Goldwater moved for a TRO and preliminary injunction under Fed. R. Civ. P. 65 to enjoin Defendants and their agents from:

    a.    Using any of Goldwater's confidential and proprietary information, including customer information;

    b.    Using any materials provided by Magler to Caliber, Farris or Waller prior to her resignation from Goldwater;

    c.    Retaining any of Goldwater's confidential and proprietary information, including customer information;

    d.    Retaining any materials provided by Magler to Caliber, Farris or Waller prior to her resignation from Goldwater;

---

email to Waller, Magler provided a list of the "files" that she would be submitting. (Doc. 9-3 at 28). In that email, there are six lines of redacted text, which presumably correspond to six distinct loans. (*Id.*). There are six confirmation emails indicating that an application was successfully submitted. (*Id.* at 51–62). Magler, Farris, and Waller submitted declarations from seven individuals that left Goldwater to work with Magler. (Docs. 21-3 through 21-9). However, one of those individuals stated that they ultimately decided to pursue a loan elsewhere. (Doc. 21-8 ¶ 5). Thus, the record *currently* before the Court suggests that there were six loans allegedly diverted away from Goldwater. Of course, that number may change pending further investigation and discovery.

1             e.       Soliciting or rendering services to any of Goldwater's current or past customers for a period of twelve (12) months; and

             f.       Engaging in any activity constituting unfair competition against Goldwater. (Doc. 9 [Motion]; Doc. 9-1 [Proposed Order]). According to Goldwater, "[u]nless Defendants are immediately enjoined, [it] will continue to suffer irreparable harm for which it has no adequate remedy at law." (Doc. 9 at 2).

## III.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def, Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The plaintiff must show: "(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *Poder in Action v. City of Phoenix*, 481 F.Supp.3d 962, 969 (D. Ariz. 2020) (citing *Winter*, 555 U.S. at 20). In the Ninth Circuit, a court may consider these factors under a "sliding scale approach" where a showing of "serious questions going to the merits" and a balance of hardships tipping "sharply" in the movant's favor may offset weaker showings on the other two factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). A showing on all four factors is required under either standard. *Id.* at 1132. TROs and preliminary injunctions are governed by the same standards. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *V'Guara Inc. v. Dec*, 925 F.Supp.2d 1120, 1123 (D. Nev. 2013).

## IV.    ANALYSIS OF *WINTER* ELEMENTS

### A.    Irreparable Harm

Goldwater has not shown that it is likely to suffer "irreparable" harm in the absence of the requested injunctive relief. "Irreparable harm is harm for which there is no adequate remedy at law, such as money damages." *E\*Trade Fin. Corp. v. Eaton*, 305 F.Supp.3d 1029, 1036 (D. Ariz. 2018) (citing *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)). "A plaintiff seeking a preliminary injunction must demonstrate that

irreparable injury is *likely* in the absence of preliminary relief." *Enyart v. Nat'l Conference of Bar Exam'rs*, 630 F.3d 1153, 1165 (9th Cir. 2011) (emphasis added). "Mere *possibility* of [irreparable] harm is not enough." *Id.* (emphasis added). The plaintiff "must proffer evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013).

In its Motion, Goldwater argued that "[i]njunctive relief is needed and warranted to preserve the *status quo* and prevent Defendants from profiting on Goldwater's confidential customer information." (Doc. 9 at 2.) However, Goldwater has not shown that it has suffered or likely will suffer any harm "for which there is no adequate remedy at law," *i.e.*, harm incapable of being reduced to monetary damages. The loans that Defendants allegedly misappropriated have a specific dollar amount attached to them that can be readily quantified. Nathan Raich, a Goldwater regional manager and Magler's former supervisor, testified at the September 24, 2021 hearing that Goldwater's "average" loan value is between $235,000 and $285,000. (Doc. 63 at 30). Thus, the alleged harm resulting from the alleged misappropriation of the loans is not one that is "irreparable" because it can be reduced to a specific dollar amount based on the value of the loan.

Nonetheless, Goldwater argued at the hearing that the alleged harm from the alleged misappropriation of the loans is not limited to just the value of the loans. Goldwater argued and proffered testimony that it will also likely suffer damage to its reputation, lose prospective customers, and lose protection in its purported trade secrets. As explained below, Goldwater's arguments and proffered testimony to such are largely speculative. Moreover, Goldwater has not shown the misappropriation of anything that constitutes a "trade secret."

### 1.   Loss of Prospective Customers and Referrals

At the hearing, Raich characterized the harm to Goldwater, in part, as a loss of "future opportunities" by way of lost referrals from potential customers and referral partners, explaining that by losing a customer, Goldwater also loses an "opportunity" for "growth and building [its] brand in the neighborhood." (*Id.* at 28–29). According to Raich,

"if you do a good job, [customers] refer you to their friends or family, their coworkers, and it just keeps going." (*Id.* at 30). These allegations, however, are speculative as they rest on the unfounded assumptions that: (1) the allegedly diverted customers would have closed their loans at Goldwater; (2) the allegedly diverted customers would have subsequently referred other individuals to Goldwater; and (3) the individuals referred to Goldwater would have closed their loans at Goldwater.

Additionally, Raich testified to potentially "endless" harms resulting from the loss of a referral source, but stated, "I can't identify [harms] I don't know." (*Id.* at 29). Raich testified that Magler was provided with numerous referrals and referral sources while employed at Goldwater, including: 123 "live transfer phone calls" from Realtor.com leads Goldwater had purchased; Raich's own referral sources of David Wills, Blaine Brothers Home Furniture, and Adam Price Custom Homes; and "many, many more from [Goldwater's] billboards and websites and radio ads." (*Id.* at 16). When asked if he was aware of Magler attempting to use any of these referral sources, Raich testified all he knew was that Magler was "in communication" with Wills but did not know if they were working to close any loans together. (*Id.* at 31). According to Raich, Wills does not have any agreement with Goldwater requiring exclusivity of his referrals but, nonetheless, still sends referrals to Goldwater. (*Id.* at 32–33).

Raich also testified that there were "20 or 23" leads he referred to Magler that she "never entered" into Goldwater's system. (*Id.* at 17). When asked what ultimately happened to those leads, Raich testified, "I don't know. All I know is they didn't get entered into our system." (*Id.* at 18). When asked by the Court if he had any evidence that Magler was currently using those leads, Raich testified, "I do not." (*Id.* at 30). Raich testified Magler no longer receives the live transfer calls or emails from web-based referrals because she is no longer employed at Goldwater. (*Id.* at 33–34).

Goldwater's allegations and Raich's testimony as to likely irreparable harm through the loss of prospective customers and referral sources are speculative, and, to some extent, belied by Raich's own testimony where he testified that Wills still remains a referral source

for Goldwater. Goldwater, therefore, fails to show likely irreparable harm here. *Herb Reed*, 736 F.3d at 1250 ("speculation on future harm" is insufficient); *Enyart*, 630 F.3d at 1165 ("Mere possibility of harm is not enough.").

### 2.    Damage to Reputation

Goldwater argues it will likely suffer "reputational harm" from Magler's "mismanagement" of the customers' information when she sent it outside of Goldwater's servers to her personal email account and to Farris, Waller, and Caliber. (Doc. 63 at 29–30, 43–45; *see* Doc. 9-3, Ex. C, at 20–26 [emails]; Doc. 63 at 20–23). Raich testified that the potential reputational harm from these actions "*could* be devastating." (*Id.* at 29, emphasis added). As evident by Raich's own statements, such assertions are speculative and unsupported by any evidence in the record. Goldwater, therefore, fails to show likely irreparable harm here. *Herb Reed*, 736 F.3d at 1250; *Enyart*, 630 F.3d at 1165. Moreover, notwithstanding that Magler may have breached her Employment Agreement by transmitting the customers' information outside of Goldwater's servers, the record shows that in several instances she had the applicant's consent to do so. (Docs. 21-3 through 21-9).[2]

### 3.    Destruction of Trade Secrets

Goldwater argues that the allegedly misappropriated "loan packages" are "trade secrets" and that injunctive relief is necessary to preserve their secrecy. (Doc. 9 at 7–8, 11; Doc. 63 at 41–43).

The Arizona Uniform Trade Secrets Act ("AUTSA") defines a "trade secret" as "information" that: (1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." A.R.S. § 44-401.A; *see Enter. Leasing Co. of Phx. v. Ehmke*, 197 Ariz. 144, 148 (App.

---

[2]    Two of these declarations are not signed and properly executed. (*See* Docs. 21-3, 21-7). However, this does not change the Court's analysis because Goldwater's allegations regarding reputational harm remain speculative.

1999). A party alleging ownership of trade secrets "must identify the trade secrets and carry the burden of showing they exist." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)"); *see Calisi v. Unified Fin. Servs.*, 232 Ariz. 103, 106 (App. 2013).

In arguing that the loan packages are trade secrets within the meaning of AUTSA, Goldwater cites—and relies solely on—*HTS, Inc. v. Boley*, 954 F.Supp.2d 927, 944 (D. Ariz. 2013), in which the district court held that a plaintiff's "customer lists, contact information, financial information, and metrics" constituted "trade secrets" under AUTSA. (Doc. 9 at 8; Doc. 63 at 41–42). *HTS*, however, is distinguishable from the present case. First, *HTS* involved more than just customer lists and contact information; it also involved the plaintiff's financial information and metrics. Second, at issue in *HTS* was a customer *list*. Here, there is no allegation that Magler misappropriated a customer *list* from Goldwater, merely information pertaining to a few, discrete Goldwater applicants. Third, the district court in *HTS* noted the plaintiff had "developed this information over many years." *Id.* Here, in contrast, Goldwater has not shown it has spent substantial time and effort to compile the loan packages at issue or that the information contained in the loan packages would be difficult for a competitor to obtain. *See Calisi*, 232 Ariz. at 108 (finding no trade secret protection in "customer lists and personal information" where the owner failed to show either "it had made substantial efforts to develop its customers and their personal information" or "this information would be difficult for a competitor to duplicate or acquire"); *Barton & Assocs. Inc. v. Trainor*, 507 F.Supp.3d 1163, 1167 (D. Ariz. 2020) ("[I]nformation about a third party is not confidential if competitors could obtain the same information directly from the third party"); *V'Guara*, 925 F.Supp.2d at 1126 (finding a protectable trade secret where the plaintiff "invested several years and hundreds of thousands of dollars in the development, manufacturing, marketing and distribution" of its product). The mere fact the loan packages contained confidential information does not render them "trade secrets." *See Calisi*, 232 Ariz. at 109 ("Although there may be substantial overlap between confidential information and trade secrets, they are not

synonymous."); *Ehmke*, 197 Ariz. at 150 ("[N]ot every commercial secret qualifies as a trade secret. Only those secrets affording a demonstrable competitive advantage may properly be considered a trade secret.").

Under these facts, Goldwater fails to show ownership of any "trade secrets" warranting protection through injunctive relief.

### B.    Balance of Equities & Public Interest

To qualify for injunctive relief, Goldwater must also establish that the balance of equities tips in its favor and that issuing the injunction is in the public interest. *Winter*, 555 at 20. "[T]he balance of equities and consideration of the public interest [] are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id.* at 32. In considering the former, the Court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quotes and citation omitted). In considering the latter, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotes and citation omitted).

Goldwater argues the requested relief "would cause little (if any) hardship on Defendants, as it would simply prevent Defendants from using Goldwater's confidential customer information and trade secrets." (Doc. 9 at 11). It further argues the requested relief is in the public interest because "public policy mandates the protection of trade secrets and confidential information through injunction." (*Id.* at 12, quotes and citation omitted). Goldwater asserts granting the requested relief will therefore "further the public interest, and will have no impact on the public at large." (*Id.*).

Goldwater's assertions downplay the potential and reasonably foreseeable effects of granting the relief requested, specifically, the potential hardships it could impose on Defendants, and more significantly, the borrowers whose loans Defendants have closed on and who are blameless in the present dispute. The relief requested by Goldwater would prohibit Defendants from, *inter alia*, "retaining" or "using" any of the customer information Magler provided to them. (*See* Doc. 9-1 at 4). Given that many—if not all—

of the allegedly diverted loans have since closed, implementing and enforcing Goldwater's proposed order would undoubtedly pose some risk of potential hardship on Defendants and the borrowers, *e.g.*, invalidating or nullifying the closed loans, forcing the borrowers to expend time and resources seeking alternative financing options, and, at worst, displacing the borrowers from their home—a result that would certainly not be in the public interest.

Granting the relief requested would also prohibit Defendants from "retaining" the customer information (*id.*) in violation of 12 C.F.R. § 1026.25(c)(1)(ii)(A), which requires lenders to maintain application materials submitted by borrowers for up to five years. (*See* Doc. 62). In arguing the contrary, Goldwater argues that "[u]nder the injunction, Caliber would be free to retain all documents required under 12 C.F.R. § 1026.25" and required only to "return to Goldwater *copies* of all confidential information and trade secrets it received from Magler and certify the same." (Doc. 71 at 4, emphasis added). However, that is not what is stated or implied in the proposed order and, in any event, would not change the Court's analysis on these issues.

By contrast, the hardships imposed on Goldwater in the absence of the relief would be little to none, particularly where, as discussed above, Goldwater is unlikely to suffer any harm that cannot be adequately compensated through monetary damages. Goldwater therefore fails to show that the requested TRO and preliminary injunction is in the public interest and that the balance of equities tips in its favor.

## C.     Likelihood of Success on the Merits

Because Goldwater has failed to show likely irreparable harm, the Court need not address whether it is likely to succeed on the merits. *See Oakland Trib., Inc. v. Chronicle Publ'g. Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985) ("Because the [plaintiff] has not [shown irreparable harm] we need not decide whether it is likely to succeed on the merits."); *see also L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co., Inc.*, 506 F.Supp.3d 1018, 1035 n.8 (C.D. Cal. 2020) ("A court need not analyze all four factors when denying a motion for a preliminary injunction.").

## V.     CONCLUSION

1    Goldwater has not made a showing on all four *Winter* elements and, therefore, is

2    not entitled to a TRO or preliminary injunction. Accordingly,

3    **IT IS ORDERED** that Goldwater's Motion for a Preliminary Injunction (doc. 9) is

4    **DENIED**.

5    **IT IS FURTHER ORDERED** that Goldwater's Motion for a Temporary

6    Restraining Order (doc. 9) is **DENIED** as moot.

7    Dated this 6th day of October, 2021.

8

9

10    Honorable Michael T. Morrissey
      United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28